Bradley I. Ruskin
bruskin@proskauer.com
Jeffrey H. Warshafsky
jwarshafsky@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Phone: (212) 969-3000
Facsimile: (212) 969-2900

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

|  |  |  |
|---|---|---|
| THE NATIONAL FOOTBALL LEAGUE; and NFL PROPERTIES LLC, | : | No. 13-cv-2572 (LGS) |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| v. | : |  |
|  | : | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A DEFAULT JUDGMENT AND PERMANENT INJUNCTION** |
| GONG SUNMEI D/B/A NFL-2013.COM; WENG DONG d/b/a NEWYORKGIANTSPROSHOP.COM; SU DANDAN d/b/a NFLGOODSHOP.COM; XIONGJIN CHEN d/b/a NFLNIKEJERSEYSM.COM; MA QIFENG d/b/a 2013-NEW-JERSEYS.com, *et al.*, | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
| Defendants. | : |  |

------------------------------------------------------------X

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 2

FACTUAL BACKGROUND .................................................................................................... 3

    A.    Procedural History ................................................................................................. 3

    B.    The NFL Owns Protectable Trademark Rights in Its NFL Trademarks ................. 4

    C.    Defendants Have Willfully Counterfeited the NFL Marks ..................................... 6

ARGUMENT ......................................................................................................................... 10

    A.    Defendants Are Subject to Personal Jurisdiction ................................................. 10

    B.    The NFL Has Met the Prerequisites for Default Judgment ................................. 13

    C.    The NFL Should Prevail on Its Trademark Counterfeiting and
           Cybersquatting Claims ......................................................................................... 14

           1.    The NFL Has Proven Its Claim for Trademark Counterfeiting ................ 14

                      i.    The NFL Marks Are Valid and Protectable ................................... 14

                      ii.    Consumers Are Likely To Be Confused About the Source
                            of Defendants' Counterfeit Products ............................................. 15

           2.    The NFL Has Proven Its Claim for Cybersquatting ................................. 17

                      i.    The NFL Marks Are Distinctive and Famous ................................. 17

                      ii.    The Infringing Domain Names Are Identical or
                            Confusingly Similar to the NFL Marks ......................................... 17

                      iii.    Defendants Have Shown Bad Faith Intent to Profit from the
                            NFL Marks ..................................................................................... 19

    D.    The Court Should Award Maximum Statutory Damages for Willful
           Trademark Counterfeiting and Cybersquatting ................................................... 20

    E.    The Court Should Permanently Enjoin Defendants' Counterfeiting
           Operations ........................................................................................................... 25

CONCLUSION ....................................................................................................................... 26

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Network, Inc. v. Access Am./Connect Atlanta*,
    975 F.Supp. 494 (S.D.N.Y. 1997)......................................................................11

*Banff, Ltd. v. Federated Dep't. Stores Inc.*,
    841 F.2d 486 (2d Cir. 1988)........................................................................14, 15

*Bensusan Rest. Corp. v. King*,
    126 F.3d 25 (2d. Cir 1997)............................................................................10

*Best Van Lines, Inc. v. Walker*,
    490 F.3d 239 (2d Cir. 2007)..........................................................................11

*Burberry Limited v. John Doe 1 a/ka Hau Chen et al.*,
    No. 1:12-cv-08815-TPG (S.D.N.Y. June 4, 2013) ................................................22

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)..........................................................................11

*Columbia Pictures Indus. v. King*,
    No. 08-CV-4461, 2010 U.S. Dist. LEXIS 30091 (E.D.N.Y. Mar. 29, 2010)..........................13

*Cutco Indus., Inc. v. Naughton*,
    806 F.2d 361 (2d. Cir 1986)..........................................................................10

*Deckers Outdoor Corp v. Does 1-100*,
    No. 1:11-Civ.-07970 (N.D. Ill. May 22, 2012)......................................................24

*Deckers Outdoor Corp v. Does 1-100*,
    No. 1:12-Civ.-00377 (N.D. Ill. Apr. 11, 2012)......................................................24

*Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc.*,
    No. 01 Civ. 2950 (DAB) (DCF), 2005 U.S. Dist. LEXIS 19496 (S.D.N.Y. Sept. 6,
    2005), *aff'd*, 194 Fed. Appx. 81 (2d Cir. 2006) ................................................17

*Freedom Calls Found. v. Bukstel*,
    2006 U.S. Dist. LEXIS 19685 (E.D.N.Y. Mar. 3, 2006)..........................................18

*Fustok v. ContiCommunity Servs., Inc.*,
    873 F.2d 38 (2d Cir. 1989)............................................................................20

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
    286 F. Supp. 2d 284 (S.D.N.Y. 2003)...............................................................16

*Gucci America, Inc. v. Curveal Fashion,*
   No. 09-Civ. 8458 (RJS) (S.D.N.Y. Jan. 20, 2010)...................................................23

*Gucci America, Inc v. Tyrrell-Miller,*
   678 F. Supp. 2d 117 (S.D.N.Y. 2008)...................................................................20

*Hanson v. Denckla,*
   357 U.S. 235 (1958)...............................................................................................10

*Harrods Ltd. v. Sixty Internet Domain Names,*
   157 F. Supp. 2d 658 (E.D. Va. 2001), *aff'd,* 302 F.3d 214 (4th Cir. 2002)............18

*Int'l Shoe Co. v. Washington,*
   326 U.S. 310 (1945)...............................................................................................10

*Levi Strauss & Co. v. Ding Shijun,*
   No. 11-Civ-7495 (WHP) (S.D.N.Y. Jan. 4, 2012)...................................................22

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,*
   631 F. Supp. 735 (S.D.N.Y. 1985), *aff'd,* 799 F.2d 867 (2d Cir. 1986).................15

*Lorillard Tobacco Co. v. Jamelis Grocery, Inc.,*
   378 F. Supp. 2d 448 (S.D.N.Y. 2005)..............................................................14, 16

*Louis Vuitton Malletier & Oakley, Inc. v. Veit,*
   211 F. Supp. 2d 567 (E.D. Pa. 2002) ....................................................................19

*Lucas Nursery & Landscaping, Inc. v. Grosse,*
   359 F.3d 806 (6th Cir. 2004) .................................................................................17

*Lyons P'ship, L.P. v. D&L Amusement & Entm't,*
   702 F. Supp. 2d 104 (E.D.N.Y. 2010) ...................................................................26

*M. Shanken Communs., Inc. v. Cigar500.com,*
   No. 07 Civ. 7371 (JGK), 2008 U.S. Dist. LEXIS 51997 (S.D.N.Y. July 7, 2008)..............13

*Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.,*
   264 F.3d 32 (2d Cir. 2001)....................................................................................12

*Mattel, Inc. v. Internet Dimensions, Inc.,*
   No. 99 Civ. 10066 (HB), 2000 U.S. Dist. LEXIS 9747 (S.D.N.Y. July 13, 2000) ............17,18

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.,*
   84 F.3d 560 (2d Cir. 1996)...............................................................................12,13

*N.A.S. Import, Corp. v. Chenson Enters., Inc.,*
   968 F.2d 250 (2d Cir. 1992)...................................................................................21

iii

*New York v. Green,*
    420 F.3d 99 (2d Cir. 2005) ....................................................................................14

*Otokoyama Co. v. Wine of Japan Import, Inc.,*
    175 F.3d 266 (2d Cir. 1999) ..................................................................................14

*Parker Waichman Alonso LLP v. The Orlando Firm, P.C.,*
    No. 09 Civ. 7401 (CM), 2010 U.S. Dist. LEXIS 47957 (S.D.N.Y. May 14, 2010) ...............12

*Penguin Group (USA), Inc. v. American Buddha,*
    16 N.Y.3d 295 (2011) .........................................................................................11,12

*Philip Morris USA Inc. v. Marlboro Express,*
    No. CV 03-1161 (CPS), 2005 WL 2076921 (E.D.N.Y. Aug. 26, 2005) ...............................21

*Philip Morris United States, Inc. v. U.S. Sun Star Trading, Inc.,*
    No. CV 08-0068 (KAM) (JO), 2010 U.S. Dist. LEXIS 52795 (E.D.N.Y. Mar. 11,
    2010) .............................................................................................................14, 20

*Polaroid Corp. v. Polarad Elecs. Corp.,*
    287 F.2d 492 (2d Cir. 1961), *cert. denied,* 368 U.S. 820 (1961) .......................................15,16

*Prime Publrs., Inc. v. American-Republican, Inc.,*
    160 F. Supp. 2d 266 (D. Conn. 2001) .....................................................................18

*Rolex Watch U.S.A., Inc. v. Brown,*
    No. 01 Civ. 9155, 2002 WL 1226863 (S.D.N.Y. June 5, 2002) ........................................22

*Sara Lee Corp. v. Bags of New York, Inc.,*
    36 F. Supp. 2d 161 (S.D.N.Y. 1999) ......................................................................22

*Silhouette Int'l Schmied AG v. Chakhbazian,*
    No. 04 Civ.3613 RJH AJP, 2004 WL 2211660 (S.D.N.Y. Oct. 4, 2004) ..............................22

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC,*
    450 F.3d 100 (2d Cir. 2006) ..................................................................................11

*The National Football League v. Chen Cheng d/b/a nfljerseydiscount.com,*
    No. 11-Civ-0344 (WHP) (S.D.N.Y. Jan. 19, 2011) ......................................................22,23

*The National Football League v. Momo Lee d/b/a nflnfl.us,*
    No. 11-Civ-8911 (PKC) (S.D.N.Y. Dec. 7, 2011) ........................................................22

*The North Face Apparel Corp and PRL USA Holdings Inc v. Fujian Sharing Import &
Export Ltd. Co. d/b/a b2bsharing.com, et al.,*
    No. 10-Civ-1630 (AKH)( S.D.N.Y. Mar. 2, 2010) ........................................................23

iv

*Tiffany (NJ) Inc. v. Luban,*
   282 F. Supp. 2d 123 (S.D.N.Y. 2003)........................................................................21

*Tory Burch LLC v. Yong Sheng International Trade Co., Ltd,*
   No. 10-Civ-9336 (DAB)(S.D.N.Y. Dec. 17, 2010) ................................................23

*U2 Home Entm't., Inc v. Fu Shun Wang,*
   482 F.Supp.2d 314 (E.D.N.Y 2007) ........................................................................20

*Zippo Mfg. Co. v. Zippo Dot Com, Inc.,*
   952 F. Supp. 1119 (W.D. Pa. 1997)........................................................................11

STATUTES/ RULES

15 U.S.C. § 1057(b) ..............................................................................................................15

15 U.S.C. § 1114 ..................................................................................................................20

15 U.S.C. § 1116(a) ..............................................................................................................26

15 U.S.C. §§ 1116(d) ............................................................................................................21

15 U.S.C. § 1117 ..................................................................................................................20

15 U.S.C. § 1117(c) ..............................................................................................................21

15 U.S.C. § 1117(c)(2) ..................................................................................................3, 22,24

15 U.S.C. § 1117(d) ......................................................................................................3, 21,25

15 U.S.C. § 1125(d) ..............................................................................................................17

15 U.S.C. § 1125(d)(1)(B)(i)(V) ..........................................................................................19

15 U.S.C. § 1125(d)(1)(B)(i)(VII) ..................................................................................19,20

15 U.S.C. §§ 1127 ................................................................................................................16

Anti-Cybersquatting Consumer Protection Act of 1996 ......................................................17

C.P.L.R. § 302(a)(1) ......................................................................................................10,11,12

C.P.L.R. § 302(a)(3)(ii) ..................................................................................................11,12

Fed. R. Civ. P. 8(b)(6) ..........................................................................................................14

Fed. R. Civ. P. 55(a) ............................................................................................................13

Fed. R. Civ. P. 55(b)(2) ........................................................................................................32

S.D.N.Y. L. Civ. R. 55.1 ...........................................................................................................13,14

THE NATIONAL FOOTBALL LEAGUE and NFL PROPERTIES LLC (collectively, "NFL" or "Plaintiffs") respectfully submit this Memorandum of Law in support of their Application for a Default Judgment and Permanent Injunction Order against GONG SUNMEI d/b/a NFL-2013.COM; WENG DONG d/b/a NEWYORKGIANTSPROSHOP.COM; SU DANDAN d/b/a NFLGOODSHOP.COM; XIONGJIN CHEN d/b/a NFLNIKEJERSEYSM.COM; MA QIFENG d/b/a 2013-NEW-JERSEYS.COM; ZHENGFA XUE d/b/a NFLJERSEYS-SUPPLY.COM; XU LIANG d/b/a WHOLESALE-NFL-JERSEYS-SHOP.COM; LILAN CHEN d/b/a SNAPBACKHATSONLINE.COM; JONE JOCKE d/b/a CHEAPJERSEYSNEED.COM; RIBERA SESMA d/b/a YOOCHEAPJERSEYS.COM; WANG SEEKBEST d/b/a WHOLESALEJERSEYSES.COM; ZHENG LITTLE d/b/a 2012WHOLESALEJERSEYSNFL.COM; ZHANG QIAN d/b/a NFLNIKEJERSEYSM.COM; ALVAREZ REGGIE d/b/a NFLSHOPUS.US; ESTHER ZIZZO d/b/a YERNFL.ORG; WEIFANG d/b/a WHOLESALEJERSEYSBEST.COM; FANGXL d/b/a FROMCHINAJERSEYS.COM; GROUP JERSEYS d/b/a GROUPJERSEYS.COM; GUIFAN HUAN d/b/a BESTNFLJERSEYSSALE.COM; FANGXI CHENXIUQULI d/b/a USWHOLESALEJERSEYSTORE.COM; and XYZ COMPANIES, JOHN DOES, and JANE DOES (collectively, "Defendants") for trademark counterfeiting and cybersquatting arising under the Trademark Act of 1946, 15 U.S.C. §§ 1051 *et seq*., as amended by the Trademark Counterfeiting Act of 1984, Public Law 98-473 (October 12, 1984), the Anti-Cybersquatting Consumer Protection Act of 1996, Pub. L. 104-153 (July 2, 1996), and the Prioritizing Resources and Organization for Intellectual Property Act of 2007, H.R. 4279 (October 13, 2008) (the "Lanham Act"). This Court has original jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1338(a) and (b); and 15 U.S.C. §§ 1116 and 1121.

## PRELIMINARY STATEMENT

The NFL, the most popular spectator sport in the United States, owns controls and/or licenses numerous trademarks and service marks used in connection with NFL Football and the sale of products bearing those marks, including, for example, football jerseys, headwear, t-shirts, other apparel, collectables and other merchandise.

The NFL brought this action against a group of interrelated Defendants selling counterfeit NFL football jerseys and other products on thousands of 'rogue' Internet websites designed to deceive consumers in the United States, including in this Judicial District, into believing they are buying genuine NFL products. To date, the NFL has identified 1,997 such websites that Defendants operate. These websites are written in English, accept payment in US dollars, accept payment by PayPal and/or major credit cards, often use domain names incorporating the NFL trademarks, and copy original photos, proprietary designs and language directly from the NFL's own web store. The NFL has demonstrated that each Defendant has operated under a number of inconsistent and false identities in order to avoid liability. Defendants' counterfeiting has been and continues to be extremely damaging to the NFL, which is deprived of sales of its legitimate NFL products and is subject to a loss of goodwill from these low-quality counterfeits.

The NFL was granted a Temporary Restraining Order followed by a Preliminary Injunction Order and then a Supplemental Preliminary Injunction Order, *inter alia*, enjoining Defendants' sale of counterfeit NFL products and operation of these 'rogue' websites. Despite this, no Defendant has responded to the NFL's Complaint, Amended Complaint, or otherwise made an appearance in this case. Instead, Defendants have ignored this action and the Court's Orders, and continued to sell counterfeit NFL products via 'rogue' websites. Each Defendant is now in default and all of the prerequisites for a default judgment have been met. The Clerk of this Court has entered a default against each Defendant. The NFL now seeks a final judgment

under Fed. R. Civ. P. 55(b)(2) that each Defendant is liable for trademark counterfeiting and cybersquatting, as alleged in the NFL's Amended Complaint. The NFL further seeks an award of statutory damages under 15 U.S.C. § 1117(c)(2) for one hundred fifty million dollars ($150,000,000) against Defendants for willfully counterfeiting the NFL trademarks. The NFL further seeks an award of maximum statutory damages for willful cybersquatting under 15 U.S.C. § 1117(d) for one hundred thousand dollars ($100,000) per Infringing Domain Name (as defined below) registered and operated by Defendants. Large statutory damage awards of this nature have been granted in many cases involving an interrelated network of 'rogue' websites selling counterfeit goods. Finally, the NFL seeks a permanent injunction prohibiting Defendants from selling counterfeit NFL products, including an order that the domain names used by Defendants to sell counterfeit NFL products be transferred to the NFL.

## FACTUAL BACKGROUND

### A.      Procedural History

On April 18, 2013, the NFL initiated this action by filing a Complaint against Defendants and seeking *ex parte* injunctive relief to stop Defendants' sale of counterfeit NFL football jerseys and other NFL products. (June 21, 2013 Declaration of Jeffrey H. Warshafsky ("Warshafsky Decl.") ¶ 4.) On April 18, 2013, the Court granted the NFL's requested Temporary Restraining Order, Order to Disable Certain Websites, Asset Restraining Order, Expedited Discovery Order, Order Allowing Service by Electronic Mail, and Order to Show Cause for Preliminary Injunction (the "Temporary Restraining Order"). (*Id.*) Pursuant to the Temporary Restraining Order, the NFL properly served each Defendant with the Summons, Complaint, Temporary Restraining Order and all other papers filed in this action on April 19, 2013. (*Id.* ¶ 5.) No Defendant or Defendant's counsel appeared at the show cause hearing. (*Id.* ¶ 6.) On April 24, 2013, the Court

entered a Preliminary Injunction Order (the "Preliminary Injunction Order") against each Defendant, extending the principal terms of the Temporary Restraining Order. (*Id.*)

After discovering that Defendants were continuing to sale counterfeit products on newly detected websites (the "Newly-Detected Infringing Websites") the NFL moved for a Supplemental Preliminary Injunction Order to extend the terms of the Preliminary Injunction Order to the Newly-Detected Infringing Websites on May 22, 2013. (*Id.* ¶ 7.) On May 29, 2013 the Court entered a Supplemental Preliminary Injunction Order against the Newly-Detected Infringing Websites. (*Id.*) On June 5, 2013, the NFL served Defendants with an Amended Complaint that identified the Newly-Detected Infringing Websites, and also alleged that Defendants were operating, or thereafter would operate, additional Infringing Websites that had not yet been detected. (*Id.* ¶ 8.) No Defendant has filed an Answer to the Complaint or Amended Complaint, moved to dismiss, or otherwise appeared in any way. (*Id.* ¶ 11.) On June 20, 2013 the Clerk of the Court entered a default against each Defendant.  (*Id.* ¶ 13, Ex. 1.)

**B.**     **The NFL Owns Protectable Trademark Rights in Its NFL Trademarks**

As set forth in the Memorandum of Law in Support of the Temporary Restraining Order and supporting declarations, the NFL is the owner of a well-established family of famous NFL trademarks and service marks registered with the U.S. Patent and Trademark Office, including, *inter alia*, the following federal registrations:

| Registration Number | Trademark | Goods and Services |
|---|---|---|
| 3,394,343 | NFL | <u>Class 25</u> - Men's, women's and children's clothing, namely, fleece tops and bottoms, headwear, caps, knit hats, T-shirts, shirts, turtlenecks, sweatshirts, shorts, tank tops, sweaters, pants, jackets, golf |

| | | |
|---|---|---|
| | | shirts, knit shirts, jerseys, wristbands, warm up suits, gloves, ties, cloth bibs, sleepwear, namely, bathrobes, nightshirts and pajamas, underwear, socks, towels, footwear, sneakers |
| 3,581,281 |  | Class 25 - Clothing, namely, fleece tops and bottoms, headwear, caps, knit hats, t-shirts, shirts, turtlenecks, sweatshirts, shorts, tank tops, sweaters, pants, jackets, golf shirts, knit shirts, jerseys, wristbands, warm up suits, gloves, ties, cloth bibs; sleepwear, namely, bathrobes, night shirts and pajamas; underwear, socks; footwear; sneakers |

(April 16, 2013 Declaration of Anastasia Danias ("Danias Decl.") ¶¶ 7-8.) These and the other federal trademark registrations listed in the NFL's Amended Complaint are valid, subsisting, unrevoked and uncancelled and most have become incontestable. (*Id*. ¶ 8.) In addition, each of the thirty-two (32) Member Clubs that form the NFL owns federal trademark registrations on its names, logos, designs and other indicia associated with its particular football team (*e.g.*, New York Giants, Pittsburgh Steelers) including those for use on football jerseys, headwear, other apparel, collectibles and other merchandise. (*Id.* ¶ 9.) NFL Properties LLC is the authorized representative of the NFL and its thirty-two Member Clubs for the licensing and protection of their names, logos, symbols and other identifying marks (collectively, the "NFL Marks"). (*Id*.)

The NFL has established an extremely successful business in the commercial licensing of the NFL Marks. The NFL has successfully marketed and promoted the NFL Marks on and in connection with many different goods and services through its licensees, sponsors and other business partners. One of the NFL's most successful and valuable areas of licensing is for

officially-licensed NFL products including football jerseys, headwear, other apparel, collectibles and other merchandise (the "NFL Products"). (*Id.* ¶ 11.)

Genuine NFL Products are distributed and sold in Member Clubs' stadiums, as well as in department stores, sporting goods stores and other brick-and-mortar retail locations in the United States and abroad, and through the NFL's Internet web store located at www.nflshop.com ("NFLShop.com"), and other authorized online web stores, including web stores operated by the Member Clubs (*e.g.*, www.shop.dolphins.com, the official web store of the Miami Dolphins, or http://proshop.patriots.com, the official web store of the New England Patriots), from which a significant portion of sales of NFL Products are made. (*Id.* ¶12.) NFLShop.com features the NFL Marks as indicators of authenticity as well as proprietary images and designs, including images of genuine NFL Products. The NFL has devoted and continues to devote a great deal of time and resources to creating these images and designs used on NFLShop.com. NFLShop.com is extremely popular, enjoying millions of unique visitors per month. (*Id.* ¶ 13.) The NFL prominently displays the NFL Marks in its advertising and promotional materials. The NFL has spent substantial amounts in advertising and promoting the NFL Marks and NFL Products. (*Id.* ¶ 14.) The continuous and extensive use of the NFL Marks in connection with NFL football and NFL Products has enabled the NFL to achieve widespread fame, and has made the NFL Marks themselves among the most famous and widely-recognized marks in the United States. (*Id.*)

## C.    Defendants Have Willfully Counterfeited the NFL Marks

As set forth in more detail in the Memorandum of Law in Support of the Temporary Restraining Order and supporting declarations, Defendants are an interrelated group of anonymous counterfeiters manufacturing, importing, distributing, advertising, offering to sell and selling counterfeit versions of NFL Products bearing the NFL Marks ("Counterfeit Products") to consumers in New York and elsewhere in the United States. Defendants created

and operated thousands of 'rogue' websites that offer to sell, and sell Counterfeit Products (*See* April 15, 2013 Declaration of Paul Dagum ("April 15, 2013 Dagum Decl.") ¶ 15; May 16, 2013 Declaration of Paul Dagum ("May 16, 2013 Dagum Decl.") ¶¶ 12-13), including those 1,997 such websites detected to date and identified in Schedules A and B to the Amended Complaint (collectively, the "Infringing Websites"). (Dkt. 36.)

The Infringing Websites are sophisticated-looking, are written in English, accept payment in US currency, and accept payment through PayPal, Western Union, and/or major credit cards. (April 15, 2013 Dagum Decl. ¶ 16.) Defendants have copied and used actual photographs of NFL Products taken directly from NFLShop.com, as well as the NFL's proprietary images and designs, such as the NFL Shield and the "NFL SHOP" banner, which states that the website is "The Official Online Store of The NFL." (*Id*. ¶ 17, Ex. B; Danias Decl. ¶ 20.) In addition, both to appear legitimate and to generate higher rankings on Internet searches for "NFL jerseys" and similar searches, Defendants have located many of the Infringing Websites at domain names containing the NFL Marks (*e.g.*, www.nflshopclearance.com, www.newyorkgiantsproshop.com) (the "Infringing Domain Names") (April 15, 2013 Dagum Decl.¶ 18; May 16, 2013 Dagum Decl. ¶ 15; Danias Decl ¶ 20.)

Defendants claim to sell genuine NFL Products, but, in fact, all of the products they sell are counterfeit. (April 15, 2013 Dagum Decl. ¶¶ 20-21.) In the course of the investigation the NFL commissioned prior to bringing this action, the NFL's outside investigators purchased 37 items advertised as genuine NFL Products, from 20 different Infringing Websites, and each product has been identified as a Counterfeit Product. (April 12, 2013 Declaration of Julian Grijns ("Grijns Decl.") ¶¶ 12-18; Danias Decl. ¶26.) These Counterfeit Products and their shipping packaging have similar irregularities and indicia of being counterfeit, which suggests that

Defendants are closely-related and that many of the Counterfeit Products probably were manufactured by, and originate from, a common source or common sources. (Grijns Decl. ¶ 20.)

Defendants have gone to great lengths to conceal their identities. Knowing that their activities are illegal, Defendants have used false names and incomplete identification information in connection with their operation of the Infringing Websites, and in every other facet of their operation. (Dagum Decl. ¶¶ 25-32; Grijns Decl. ¶¶ 21-36.) The Infringing Websites are devoid of any information that might identify Defendants' true identities. (Grijns Decl. ¶ 22.) Defendants communicate with potential customers exclusively via the Infringing Websites and/or by email and without revealing their true identities. (Grijns Decl. ¶¶ 23-24, Ex. E.)

The Internet Corporation for Assigned Names and Numbers (ICANN), the body that governs domain names, requires all who register domain names to provide accurate registration information, which is compiled in a network of publicly-available databases commonly referred to as "WhoIs." (April 15, 2013 Dagum Decl. ¶27, Ex. D.) Nonetheless, in many of Defendants' domain name registrations, as documented by the NFL's outside investigators, Defendants' names and addresses in the WhoIs database were incomplete or nonsensical, contained randomly-typed letters, failed to include cities or states, or used a privacy service to conceal information. (*Id.* ¶ 28.)

Defendants have uniformly used separate false identities in connection with their shipments of Counterfeit Products to the United States to avoid detection and liability for counterfeiting by United States Customs and Border Protection ("CBP") and/or by brand owners. All of the purchases received during the NFL's investigation were shipped from China via China Courier Service Corporation's Express Mail Service ("EMS"), DHL or the United States Postal Service ("USPS"). (Grijns Decl. ¶27.) These goods all arrived in similar packages with similar

markings to one another, further suggesting that many of them come from common or related

sources. (*Id.*) CBP regulations require that all packages entering the United States from another

country be accompanied by Declaration Form CN22 or Declaration Form CN23 (for commercial

shipments) that must be completed in English. (*Id.* ¶ 28, Ex. F.) Certain versions of the EMS

waybill also contain the following instructions in English and Chinese: "FOR PARCEL,

PLEASE FILL IN THE DECLARATION FORM CN23, PROVIDE COMMERCIAL INVOICE

OR PRO FORMA INVOICE AND CAREFULLY COMPLETE THE FORM BELOW IN

ENGLISH." (*Id.* ¶29). These instructions were disregarded in every one of the parcels containing

Counterfeit Products received by the NFL's outside investigators. (*Id.* ¶30, Ex. G.)

Based on limited discovery of Defendants' PayPal account records obtained to date,

Defendants' counterfeiting business is highly lucrative, with some of Defendants' PayPal

accounts earning tens of thousands of dollars in mere weeks. (Warshafsky Decl. ¶ 15.) Given the

illicit nature of Defendants' business, and Defendants' use of multiple payment methods in

addition to PayPal, it is likely that Defendants' revenues are much higher than their PayPal

account records indicate.  (*Id.*)

The NFL and its official licensees did not manufacture, inspect, package or approve the

Counterfeit Products prior to sale or distribution, nor were they asked to do so. (Danias Decl. ¶

29.) Defendants are not authorized in any way to sell the Counterfeit Products. (*Id.*) While the

Counterfeit Products have been designed to replicate genuine NFL Products, and are being sold

as such, the Counterfeit Products are not of the same quality as genuine NFL Products. (*Id.* ¶ 30.)

The Counterfeit Products are so sufficiently similar to genuine NFL Products that it is likely

consumers generally will be deceived, at least initially, into believing Defendants' Counterfeit

Products are authentic NFL Products. (*Id.* ¶ 31.) Sales of Counterfeit Products are enormously

damaging to the NFL and the Member Clubs and the goodwill built up in the NFL Marks. (*Id*. ¶ 19.)

## <u>ARGUMENT</u>

**A.     Defendants Are Subject to Personal Jurisdiction**

As set forth in more detail in the Memorandum in Support of the Temporary Restraining Order, Defendants are all subject to personal jurisdiction in New York and in this Judicial District. While it appears that Defendants are all non-residents of New York and are located in China, Defendants have more than sufficient contacts with New York to establish personal jurisdiction in this forum based on the fact that each Defendant has operated one or more fully-interactive Internet websites through which it advertises, offers to sell, and sells, Counterfeit Products directly to customers in this Judicial District and elsewhere in the US.

Personal jurisdiction over a non-resident defendant is determined by the law of the jurisdiction where the federal court sits, in this case by New York law. *See Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d. Cir 1997). Because New York does not extend personal jurisdiction to the full extent permitted under the Due Process Clause of the United States Constitution, a two-fold inquiry is required: (1) whether New York's Civil Practice Law and Rules provide for jurisdiction in this action and (2) whether exercising jurisdiction comports with due process. *See id*.; *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

Each Defendant is subject to personal jurisdiction under C.P.L.R. § 302(a)(1) here because each has offered and transacted to sell counterfeit goods in New York. Jurisdiction is appropriate under § 302(a)(1) when a defendant "purposefully avails [itself]of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Cutco Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d. Cir 1986) (*quoting Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). A "defendant need not be physically present in New York to transact

business there within the meaning . . . of [§] 302(a)(1)." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 169 (2d Cir. 2010). Not only does each Defendant, through one or more of the Infringing Websites, offer to ship Counterfeit Products to any address in the United States, including in New York, the NFL has proof of 37 goods—33 counterfeit NFL jerseys and 4 counterfeit NFL hats—that Defendants sold and shipped into New York during the course of the NFL's investigation of Defendants.  (Grijns Decl. ¶¶ 14-16, Ex. B.)

Additionally, Defendants are subject to personal jurisdiction under C.P.L.R. § 302(a)(1) because they operate hundreds of fully interactive Internet websites accessible in New York and in this Judicial District. *See Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 252 (2d Cir. 2007) (applying *Zippo* and holding that "a website's interactivity may be useful for analyzing personal jurisdiction under [§]302(a)(1) . . . insofar as it helps to decide whether the defendant 'transacts any business' in New York").

Furthermore, each Defendant is subject to personal jurisdiction under C.P.L.R. § 302(a)(3)(ii). That section grants personal jurisdiction over a non-resident defendant when "(1) [t]he defendant committed a tortious act outside the state; (2) the cause of action arose from that act; (3) the act caused injury to a person or property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the state; [and] (5) the defendant derives substantial revenue from interstate or international commerce." *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006). A commercial website that is operated outside of New York but causes a plaintiff to lose sales in New York causes harm "within the state" of New York. *See Am. Network, Inc. v. Access Am./Connect Atlanta*, 975  F.Supp. 494, 497-98 (S.D.N.Y. 1997). *See also Penguin Group (USA), Inc. v.*

*American Buddha*, 16 N.Y.3d 295, 301 (2011) (holding that in cases "involving the uploading of a copyrighted printed literary work onto the Internet," the situs of injury for purposes of determining long-arm jurisdiction is the "location of the [copyright holder's] principal place of business"). It is reasonably foreseeable that New York consequences may arise from the operation of a website intended to reach New York residents. *See Am. Network*, 975 F. Supp. at 497-98.

The Defendants in this action satisfy the five requirements under C.P.L.R. § 302(a)(3)(ii) because this action arises out of Defendants' sale of Counterfeit Products into New York, from which Defendants derive substantial revenue, and which is causing a foreseeable harm to the NFL, a resident of New York. (Danias Decl. ¶¶ 35-37.) Therefore, Defendants are subject to personal jurisdiction under both sections 302(a)(1) and 302(a)(3)(ii) of New York's long arm statute.

The due process inquiry contains two parts, the minimum contacts inquiry and the reasonableness inquiry. *See Parker Waichman Alonso LLP v. The Orlando Firm, P.C.* No. 09 Civ. 7401 (CM), 2010 U.S. Dist. LEXIS 47957, at *6 (S.D.N.Y. May 14, 2010). Under the minimum contacts inquiry, courts ask whether "the claim arises out of or relates to defendants' contacts with the state," which it clearly does in this instance, given that the entire claim relates to Defendants' sale of Counterfeit Products to United States and New York residents. *Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L.*, 264 F.3d 32, 38 (2d Cir. 2001).

The reasonableness inquiry then determines whether the "defendant purposefully availed itself of the privilege of doing business in the forum so that defendant could reasonably foresee being haled into the forum's courts," and whether the assertion of jurisdiction "comports with traditional notions of fair play and substantial justice." *Id*. at 38; *Metro. Life Ins. Co. v.*

*Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). Further, New York's social policy of protecting intellectual property owners weighs in favor a finding of reasonableness. *See, e.g.*, *M. Shanken Communs., Inc. v. Cigar500.com*, No. 07 Civ. 7371 (JGK), 2008 U.S. Dist. LEXIS 51997, at *26 (S.D.N.Y. July 7, 2008).

Here, a finding of jurisdiction is reasonable because Defendants have purposefully availed themselves of the privilege of doing business in New York by selling and shipping Counterfeit Products that extensively abuse the NFL's intellectual property into this Judicial District. (Grijns Decl. ¶¶ 14-16, Ex. B; April 15, 2013 Dagum Decl. ¶ 20; May 16, 2013 Dagum Decl. ¶¶ 12-13.) Not only could Defendants have reasonably foreseen being sued here, but they have specifically attempted to avoid being haled into this Court by hiding their identities and their assets. (Grijns Decl. ¶¶ 21-35; April 15, 2013 Dagum Decl. ¶¶ 25-31.) Accordingly, Defendants' conduct meets both prongs of New York's two-part test for personal jurisdiction, and Defendants are each subject to personal jurisdiction in New York and in this Judicial District.

## B.     The NFL Has Met the Prerequisites for Default Judgment

Rule 55 of the Federal Rules of Civil Procedure provides a two-step process for obtaining a default judgment. *See Columbia Pictures Indus. v. King*, No. 08-CV-4461, 2010 U.S. Dist. LEXIS 30091, at *2 (E.D.N.Y. Mar. 29, 2010). First, under Fed. R. Civ. P. 55(a), the clerk must enter a notation of default "[w]hen a party against whom judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Under Local Rule 55.1, "[a] party applying for a certificate of default by the clerk pursuant to Federal Rule of Civil Procedure 55(a) shall submit an affidavit showing (1) that the party against whom a notation of default is sought is not an infant, in the military, or an incompetent person; (2) that the party has failed to plead or otherwise defend the action; and

(3) that the pleading to which no response has been made was properly served." *Id. citing* S.D.N.Y. L. Civ. R. 55.1. The NFL has submitted such a declaration. (*See* Dkt. 41.) Upon such a submission by the NFL, the Clerk of the United States District Court for the Southern District of New York, Ruby J. Krajick, entered a default against each Defendant on June 20, 2013. (Warshafsky Decl. ¶ 13, Ex. 1; Dkt. 42.)

Second, upon obtaining a clerk's notation of default, "a plaintiff must next seek a judgment by default under Rule 55(b)." *New York v. Green,* 420 F.3d 99, 104 (2d Cir. 2005). In assessing whether to enter default judgment, the Court must accept as true all well-pleaded allegations in the Amended Complaint, except those pertaining to the amount of damages. Fed. R. Civ. P. 8(b)(6); *Philip Morris United States, Inc. v. U.S. Sun Star Trading, Inc*., No. CV 08-0068 (KAM) (JO), 2010 U.S. Dist. LEXIS 52795, at *8 (E.D.N.Y. Mar. 11, 2010). Even without this presumption, the NFL has shown that Defendants are liable for trademark counterfeiting and cybersquatting, as explained below.

**C.     The NFL Should Prevail on Its Trademark Counterfeiting and Cybersquatting Claims**

   **1.     The NFL Has Proven Its Claim for Trademark Counterfeiting**

To prevail on its trademark counterfeiting claims, the NFL must prove that: (1) the NFL Marks are entitled to protection; and (2) there is a likelihood of confusion between Defendants' Counterfeit Products and genuine NFL Products bearing the NFL Marks. *See, e.g., Otokoyama Co.  v. Wine of Japan Import, Inc*., 175 F.3d 266, 270 (2d Cir. 1999); *Banff, Ltd. v. Federated Dep't. Stores Inc*., 841 F.2d 486, 489-90 (2d Cir. 1988); *see also Lorillard Tobacco Co. v. Jamelis Grocery, Inc*., 378 F. Supp. 2d 448, 455 (S.D.N.Y. 2005).

i.     The NFL Marks Are Valid and Protectable

Through its pleadings, the NFL has established that it is the owner of all right, title and interest in and to the NFL Marks in connection with the same type of goods being counterfeited by Defendants, namely, football jerseys, headwear, collectibles, other apparel and other merchandise. (Danias Decl. ¶¶ 8-11.) The NFL also has demonstrated that the NFL Marks are the subject of multiple federal trademark registrations. (*Id.* ¶¶ 8-9, Ex. A and B.) These registrations are *prima facie* evidence of the validity of the NFL Marks, as well as the NFL's exclusive right to use its marks in commerce and in connection with the goods or services specified in the registrations. 15 U.S.C. § 1057(b). *See Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 631 F. Supp. 735, 740 (S.D.N.Y. 1985), *aff'd*, 799 F.2d 867 (2d Cir. 1986). Thus, the NFL Marks are valid and protectable.

ii.     Consumers Are Likely To Be Confused About the Source of Defendants' Counterfeit Products

In the Second Circuit, likelihood of confusion is assessed by the factors enunciated in *Polaroid Corp. v. Polarad Elecs. Corp*., 287 F.2d 492, 495-96 (2d Cir. 1961), *cert. denied,* 368 U.S. 820 (1961); *see also Banff, Ltd.*, 841 F.2d at 489-90. Here, each of the eight, non-exhaustive *Polaroid* factors used to analyze whether there is likelihood of confusion favors the NFL: (1) the strength of the NFL Marks—enormously strong; (2) the degree of similarity between the NFL Marks and Defendants' marks—identical or nearly identical; (3) the proximity of the NFL Products and the Counterfeit Products—sold on similar-looking websites located at similarly-named domain names; (4) the likelihood that the NFL will bridge the gap—already bridged; (5) the sophistication of the buyers—average consumers; (6) the quality of the Defendants' products—inferior to genuine NFL Products; (7) actual confusion—Defendants attract millions of visitors to their Infringing Websites and the NFL has received complaints from consumers

who were deceived by "rogue websites" into purchasing Counterfeit Products; and (8) the Defendants' intent in using the NFL Marks—bad faith intent to profit illicitly at the expense of the NFL and United States consumers. *See Polaroid*, 287 F.2d at 495. (Danias Decl. ¶¶ 8-16, 20-22; April 15, 2013 Dagum Decl. ¶ 24.)

Regardless, the court need not engage in the above-analysis because, "where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Lorillard Tobacco*, 378 F. Supp. 2d at 455. *See also Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003). The Lanham Act defines a counterfeit mark as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark" on the Principal Register of the United States Patent and Trademark Office, used by an unauthorized producer. 15 U.S.C. §§ 1116(d) and 1127.

The NFL has established that: (1) the marks used by Defendants on the Counterfeit Products are identical to or substantially indistinguishable from the NFL Marks, which the NFL is using in commerce on its genuine NFL Products; and (2) Defendants' use of the NFL Marks on the Counterfeit Products is not authorized by the NFL. *See supra* at pp. 6-9. Additionally, the NFL has learned that consumers are, in fact, being deceived by purchasing what they believe are genuine NFL Products from Internet sites only to learn after the goods arrive that they have purchased lower-quality Counterfeit Products. (Danias Decl. ¶ 22.) As such, the NFL has demonstrated that consumers are likely to be confused as to the source of Defendants' Counterfeit Products, and that consumers are actually being confused by Defendants' sale of Counterfeit Products on the Infringing Websites. Thus, the Court should find Defendants liable for trademark counterfeiting.

2.      **The NFL Has Proven Its Claim for Cybersquatting**

The Anticybersquatting Consumer Protection Act of 1996 ("ACPA") applies when a domain name registrant, with a bad faith intent to profit, "cybersquats" on a domain name that "is identical or confusingly similar to or dilutive of" the distinctive or famous mark of another. 15 U.S.C. § 1125(d). In order to prevail on an ACPA claim, a party must show that (1) its marks are distinctive and famous; (2) Defendants have registered domain names containing the identical marks; and (3) Defendants have acted in bad faith. 15 U.S.C. § 1125(d). *See Mattel, Inc. v. Internet Dimensions, Inc.*, No. 99 Civ. 10066 (HB), 2000 U.S. Dist. LEXIS 9747, at *4-6 (S.D.N.Y. July 13, 2000). Notably, one of the purposes of the ACPA is to focus on counterfeit sellers who, like Defendants here, "register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site," and counterfeit sellers who "target distinctive marks to defraud consumers." *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 809 (6th Cir. 2004). *See also Diarama Trading Co. v. J. Walter Thompson U.S.A., Inc.*, No. 01 Civ. 2950 (DAB) (DCF), 2005 U.S. Dist. LEXIS 19496, at *37-38 (S.D.N.Y. Sept. 6, 2005), *aff'd*, 194 Fed. Appx. 81 (2d Cir. 2006).

    i.      The NFL Marks Are Distinctive and Famous

The NFL has shown that its federally-registered NFL Marks are closely linked with the NFL's success, as these marks symbolize the most popular spectator sport in the United States. (Danias Decl. ¶ 5.) As a result, the NFL Marks have a high degree of acquired distinctiveness, and, in turn, the NFL has demonstrated that the NFL Marks are distinctive and famous.

    ii.      The Infringing Domain Names Are Identical or Confusingly Similar to the NFL Marks

The inclusion of a plaintiff's trademark combined with usage of the mark on the website in question has been held to be sufficient for a finding of confusing similarity for ACPA

purposes. *See Mattel, Inc.,* 2000 U.S. Dist. LEXIS at \*5. Furthermore, the addition of generic or geographic terms, such as 'buy,' 'sales,' 'store,' or 'online,' is not sufficient to distinguish the domain name from a protected mark that it contains. *See*, *e.g.*, *Prime Publrs., Inc. v. American-Republican, Inc.*, 160 F. Supp. 2d 266, 279-80 (D. Conn. 2001) (noting that the "ct" prefix, indicating Connecticut, in the domain name "ctVoices.com" was not sufficient to distinguish it from "Voices," plaintiff's mark); *Harrods Ltd. v. Sixty Internet Domain Names*, 157 F. Supp. 2d 658, 677 (E.D. Va. 2001), *aff'd*, 302 F.3d 214 (4th Cir. 2002) (holding that defendant's use of "generic or geographic terms in English or Spanish" as qualifiers "does not diminish the similarity of the defendant Domain Names to the [plaintiff's] marks"); *Freedom Calls Found. v. Bukstel*, 2006 U.S. Dist. LEXIS 19685, at \*40-41 (E.D.N.Y. Mar. 3, 2006) (holding the same regarding a ".us" domain suffix). This is because a consumer might reasonably believe that the rightful owner of the mark registered the domain and added the generic or geographic term to the domain. *See Harrods*, 157 F. Supp. 2d at 678.

Here, the 1,233 Infringing Domain Names at issue are identical or confusingly similar to the NFL Marks because they each contain one or more of the NFL Marks in its entirety and without alteration (*e.g.*, www.nflshopclearance.com; www.newyorkgiantsproshop.com). (Danias Decl. ¶ 20; April 15, 2013 Dagum Decl. ¶ 18, Ex. C and May 16, 2013 Dagum Decl. ¶ 15, Ex. 2 (listing each such Infringing Domain Name) (emphasis added).) Furthermore, the Infringing Websites located at the Infringing Domain Names are used to advertise, offer and sell purportedly-authentic NFL Products that are actually Counterfeit Products. (April 15, 2013 Dagum Decl. ¶ 20; May 16, 2013 Dagum Decl. ¶¶ 12-13.) These facts are sufficient to show that the Infringing Domain Names are identical or confusingly similar to the NFL Marks.

iii.     Defendants Have Shown Bad Faith Intent to Profit from the NFL Marks

The ACPA lists nine non-exhaustive factors that courts may consider to determine whether a defendant registered or used a domain named in bad faith.  One factor is "the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site." 15 U.S.C. § 1125(d)(1)(B)(i)(V). The registration of a trademark owner's mark as part of a domain name used to sell counterfeit versions of the trademark owner's goods is a particularly egregious form of bad faith. *See, e.g.*, *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 578, 584-585 (E.D. Pa. 2002) (granting the maximum statutory damages award for each infringing domain). Here, Defendants are using the NFL Marks in domain names used to locate the Infringing Websites, which masquerade as authentic sources of NFL Products, but, in fact, sell Counterfeit Products. (April 15, 2013 Dagum Decl. ¶ 18, Ex. C; May 16, 2013 Dagum Decl. ¶ 15.) Defendants' goal is to divert potential consumers of NFL Products to Defendants' Infringing Websites based on a mistaken impression that those websites are affiliated with or endorsed by the NFL. (Danias Decl. ¶ 20.)

Another factor that weighs in favor of finding bad faith is "the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct." 15 U.S.C. § 1125(d)(1)(B)(i)(VII). As discussed above, Defendants have registered their infringing websites with fraudulent, incomplete or hidden information. (April 15, 2013 Dagum Decl. ¶¶ 27-30.)

Finally courts also consider "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties." 15 U.S.C. § 1125(d)(1)(B)(i)(VIII). Here, Defendants have registered 1,233 domain names that contain distinctive and famous NFL Marks, and those marks were distinctive and famous at the time of registration of these domain names. (April 15, 2013 Dagum Decl. ¶ 18, Ex. C; May 16, 2013 Dagum Decl. ¶ 15.)  Given the egregious conduct described above, Defendants plainly have registered the Infringing Domain Names in bad faith.

Based on the foregoing, the Court should find each Defendant liable for willful trademark counterfeiting and cybersquatting of the NFL Marks under 15 U.S.C. §§ 1114, 1117, and 1125 (d), and should enter final default judgment against each Defendant.

## D.  The Court Should Award Maximum Statutory Damages for Willful Trademark Counterfeiting and Cybersquatting

Once liability is established against a defaulting defendant, a Court then conducts an inquiry sufficient to establish damages to a "reasonable certainty." *See Philip Morris United States, Inc. v. U.S. Sun Star Trading, Inc.,* No. cv-08-008 (KAM)(JO), 2010 U.S. Dist. LEXIS 52795, at *9-10 (E.D.N.Y. Mar. 11, 2010). It is not necessary for the District Court to hold a hearing, as long as there is a basis for the damages specified. *See Fustok v. ContiCommunity Servs., Inc*., 873 F.2d 38, 40 (2d Cir. 1989). Here, the NFL has elected to recover statutory damages under the Lanham Act, which provides a basis for the damages specified without the need for a hearing. *See Gucci America, Inc v. Tyrrell-Miller,* 678 F.Supp. 2d 117, 121 (S.D.N.Y. 2008); *U2 Home Entm't., Inc v. Fu Shun Wang*, 482 F.Supp.2d 314, 318 (E.D.N.Y 2007). In

cases of willful trademark counterfeiting, the Lanham Act provides an award of up to $2,000,000

for each counterfeited mark per type of good offered:

> In a case involving the use of a counterfeit mark (as defined in section 34(d) (15 U.S.C. § 1116(d))) in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits under subsection (a), an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or (2) *if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.*

15 U.S.C. § 1117(c) (emphasis added). Furthermore, in cases involving willful cybersquatting,

the Lanham Act separately provides an award of up to $100,000 for each domain name that is

identical or confusingly similar to one or more of plaintiff's marks. 15 U.S.C. § 1117(d).

There can be no question that Defendants' counterfeiting of the NFL Marks on the

Infringing Websites and Counterfeit Products is willful. "Willfulness is determined by whether

the defendant had knowledge that [its] conduct represented infringement or recklessly

disregarded the possibility." *Philip Morris USA Inc. v. Marlboro Express*, No. CV-03-1161

(CPS), 2005 WL 2076921, at *6 (E.D.N.Y. Aug. 26, 2005) (awarding $4,000,000 in statutory

damages on summary judgment motion against trademark counterfeiter). Knowledge "need not

be proven directly but may be inferred from the defendant's conduct." *N.A.S. Import, Corp. v.

Chenson Enters., Inc.,* 968 F.2d 250, 252 (2d Cir. 1992) (citation omitted). Indeed, where a

defendant has defaulted, the Court may infer willfulness on that ground alone. *Tiffany (NJ) Inc.

v. Luban,* 282 F. Supp. 2d 123, 124 (S.D.N.Y. 2003). The NFL has shown that each Defendant

has willfully engaged in the manufacture, importation, distribution, advertisement, offer for sale,

and/or sale of the Counterfeit Products, which are designed to look exactly like NFL Products, including via the operation of one or more Infringing Websites.

Enhanced statutory damages are intended to serve as both compensatory and punitive relief for a plaintiff who has been harmed by a willful counterfeiter. *Sara Lee Corp. v. Bags of New York, Inc.,* 36 F. Supp. 2d 161, 165 (S.D.N.Y. 1999). Statutory damages also serve as a deterrent against future counterfeiting. *Silhouette Int'l Schmied AG v. Chakhbazian,* No. 04 Civ.3613 RJH AJP, 2004 WL 2211660, at *2 (S.D.N.Y. Oct. 4, 2004); *Rolex Watch U.S.A., Inc. v. Brown,* No. 01 Civ. 9155, 2002 WL 1226863, at *2 (S.D.N.Y. June 5, 2002). These damages are necessary due to the "harsh reality" that counterfeiters "often do not keep or secrete records of their unlawful activities, thus making proof of the extent of the plaintiff's injury or the counterfeiters' profits impossible as a practical matter." *Sara Lee Corp*., 36 F.Supp. 2d at 165 (citations omitted).

Courts have wide latitude in determining the amount of statutory damages to award. *See* 15 U.S.C. § 1117(c)(2). In similar actions, Courts in this Judicial District have granted the NFL and other plaintiffs large statutory damages including up to the maximum statutory amount for willful counterfeiting. *See, e.g*., *Burberry Limited v. John Doe 1 a/k/a Hau Chen*, No. 1:12-cv-08815 (TPG) (S.D.N.Y. June 4, 2013) (awarding plaintiff $276,000,000 in statutory damages for willful infringement against all defendants); *Levi Strauss & Co. v. Ding Shijun,* No. 11-CV-7495 (WHP) (S.D.N.Y. Jan. 4, 2012) (awarding maximum statutory damages of $6,000,000 against each defendant who operated 'rogue' websites offering counterfeit products); *The National Football League v. Momo Lee d/b/a nflnfl.us*, No. 11-Civ-8911 (PKC) (S.D.N.Y. Dec. 7, 2011) (awarding maximum statutory damages of $4,000,000 against each defendant who operated 'rogue' websites offering counterfeit products); *The National Football League v. Chen Cheng*

*d/b/a nfljerseydiscount.com,* No. 11-Civ-0344 (WHP) (S.D.N.Y. Jan. 19, 2011) (awarding

maximum statutory damages of $4,000,000 against each defendant who operated 'rogue'

websites offering counterfeit products ); *Tory Burch LLC v. Yong Sheng International Trade Co.,*

*Ltd,* No. 10-Civ-9336 (DAB) (S.D.N.Y. Dec. 17, 2010) (awarding maximum statutory damages

of $4,000,000 against each defendant who operated 'rogue' websites offering counterfeit

products); *The North Face Apparel Corp and PRL USA Holdings Inc v. Fujian Sharing Import &*

*Export Ltd. Co. d/b/a b2bsharing.com, et al.,* No. 10-Civ-1630 (AKH) (S.D.N.Y. Mar. 2, 2010)

(awarding plaintiffs $78,000,000 in statutory damages for willful infringement against all

defendants); *Gucci America, Inc. v. Curveal Fashion,* No. 09-Civ. 8458 (RJS) (S.D.N.Y. Jan. 20,

2010) (awarding plaintiffs $13,000,000 in statutory damages against a single defendant based on

its willful infringement).

  As described in the NFL's pleadings, each Defendant has counterfeited a number of the

NFL Marks including, *inter alia,* the "NFL" and  trademarks, and many of the trademarks

owned by the Member Clubs, on a variety of products. The number of NFL Marks infringed by

each Defendant on NFL football jerseys alone is likely to be more than 30, given that the

counterfeit jerseys Defendants shipped to the NFL's outside investigators each displayed the

"NFL" and  trademarks, as well as at least one trademark owned by a Member Club, and

that Defendants sell NFL football jerseys for each of the thirty-two Member Clubs. To be

conservative, though, the NFL respectfully requests that the Court find that each Defendant has

infringed just three NFL Marks, specifically the "NFL" and  trademarks, and one trademark

owned by a Member Club, on just one type of goods, specifically football jerseys.

The NFL seeks maximum statutory damages for each Defendant's willful counterfeiting of each of these three NFL Marks in connection with football jerseys, and therefore respectfully requests entry of judgment against each Defendant in the amount of $6,000,000, as authorized by 15 U.S.C. § 1117(c)(2). Due to Defendants' concealing of their identities, it is not possible to determine the exact number of Defendants. In cases involving a large network of "rogue" websites operated by an interrelated group of anonymous defendants, courts have assumed that there were one hundred defendants for purposes of determining statutory damages. *See Deckers Outdoor Corp v. Does 1-100*, No. 1:11-Civ.-07970 (N.D. Ill. May 22, 2012) (finding that 101 defendants operated 1,683 total domain names, and awarding maximum statutory damages); *Deckers Outdoor Corp v. Does 1-100*, No. 1:12-Civ.-00377 (N.D. Ill. Apr. 11, 2012) (finding that 100 defendants operated 1,398 total domain names, and awarding maximum statutory damages). To be conservative, the NFL respectfully suggests that the Court use a figure of twenty-five defendants to calculate statutory damages here, which results in a total statutory damages award of $150,000,000. A statutory damages award for willful trademark counterfeiting of this magnitude also is supported by Defendants' use of at least 34 NFL Marks on a wide variety of goods, as shown in the numerous screenshots of Defendants' Infringing Websites submitted to the Court. (*See* April 15, 2013 Dagum Decl. ¶ 16, Ex. B; Grinjs Decl. ¶ 19, Ex.D; Warshafsky Decl. ¶ 18, Ex. 2.) Thus the NFL seeks a total award for willful trademark counterfeiting of $150,000,000 against all Defendants.

In addition, the NFL seeks maximum statutory damages for each of Defendants' Infringing Domain Names based on Defendants' bad faith intent to profit by registering these domain names using the NFL Marks. As authorized by 15 U.S.C. § 1117(d), the NFL respectfully requests an award of $100,000 for each of the 1,233 Infringing Domain Names, for a

total of $123,300,000.  In sum, therefore, the NFL seeks a statutory damages award of $150,000,000 for Defendants' willful trademark counterfeiting and a statutory damages award of $123,300,000 for Defendants' willful cybersquatting, for a total statutory damages award of $273,300,000 against all Defendants.

While the amount of total statutory damages the NFL seeks to recover is significant, the NFL believes that this amount is fair given the massive profits that Defendants have made and continue to make from their sales of Counterfeit Products, and the harm that such counterfeiting causes the NFL and its NFL Marks.  In addition, as noted, it is likely that each Defendant is counterfeiting more than just three NFL Marks and is counterfeiting the NFL Marks in connection with numerous types of goods. Finally, an award of this size is essential to creating a deterrent to both these Defendants and future counterfeiters. The NFL is facing the next generation of counterfeiting schemes—the operation of multiple 'rogue' websites by anonymous counterfeiters—a structure specifically designed to avoid liability. Unless Defendants come to understand that the cost of engaging in such a scheme is so great as to outweigh the millions of dollars in profits they are generating, legitimate brand owners such as the NFL have little hope of ever curtailing the damage to the goodwill and reputation they have spent decades building.

**E.**     **The Court Should Permanently Enjoin Defendants' Counterfeiting Operations**

In addition to the foregoing relief, the NFL respectfully requests the key terms of the Temporary Restraining Order and Preliminary Injunction be entered in a permanent injunction, enjoining Defendants from infringing or otherwise violating the NFL's registered trademark rights in the NFL Marks. A court may "issue an injunction on a motion for default judgment provided that the moving party shows that (1) it is entitled to injunctive relief under the applicable statute and (2) it meets the prerequisites for the issuance of an injunction." *Lyons P'ship, L.P. v. D&L Amusement & Entm't,* 702 F. Supp. 2d 104, 118 (E.D.N.Y. 2010). Under

Section 34 of the Lanham Act, a court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). To obtain a permanent injunction, the movant must establish that 1) absent injunctive relief, it will suffer irreparable harm, and 2) actual success on the merits. *Lyons P'ship,* 702 F. Supp. 2d at 119. As set forth above and in the NFL's Memorandum of Law in Support of the Temporary Restraining Order, the NFL has demonstrated that it is being irreparably harmed by Defendants' trademark counterfeiting, and for the same reasons that the Court entered the Temporary Restraining Order, Preliminary Injunction Order, and Supplemental Preliminary Injunction Order, the Court should enter a permanent injunction against Defendants.

## CONCLUSION

Defendants' sales of Counterfeit Products have irreparably harmed and continue to harm the NFL and the goodwill it has built up in its NFL Marks. Without entry of the requested relief, Defendants will continue to sell Counterfeit Products on the Infringing Websites and newly-registered 'rogue' websites, and continue to deceive prospective purchasers and others into believing these goods have been produced and authorized by the NFL, when in fact, they have not. The NFL, therefore, respectfully requests that the Court enter default judgment awarding maximum statutory damages of $150,000,000 for willful trademark counterfeiting against all Defendants, and maximum statutory damages of $100,000 for each instance of willful cybersquatting of an Infringing Domain Name, totaling an additional $123,300,000, for a total judgment of $273,300,000 against all Defendants, and enter an order permanently enjoining Defendants from counterfeiting the NFL Marks.

Dated: June 21, 2013                        Respectfully submitted,

                                            By: _____
                                                Bradley I. Ruskin
                                                Jeffrey H. Warshavsky
                                                PROSKAUER ROSE LLP
                                                Eleven Times Square
                                                New York, NY 10036
                                                Telephone: (212) 969-3000
                                                Facsimile: (212) 969-2900

                                            *Attorneys for The National Football League
                                            and NFL Properties LLC*