## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

THE NATIONAL FOOTBALL LEAGUE; and    :
NFL PROPERTIES LLC,    :     No. 13-CV-2572 (LGS)
   :
             Plaintiffs,    :
   :
           v.    :
   :
GONG SUNMEI d/b/a NFL-2013.COM; WENG   :
DONG d/b/a    :
NEWYORKGIANTSPROSHOP.COM; SU    :
DANDAN d/b/a NFLGOODSHOP.COM;    :
XIONGJIN CHEN d/b/a    :
NFLNIKEJERSEYSM.COM; MA QIFENG d/b/a  :
2013-NEW-JERSEYS.COM, *et al.*,    :
   :
          Defendants.    :
   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## DECLARATION OF PAUL DAGUM IN SUPPORT OF
## PLAINTIFFS' APPLICATION FOR A SUPPLEMENTAL ORDER

I, PAUL DAGUM, under penalty of perjury, declares and says:

1.      I submit this declaration in support of Plaintiffs THE NATIONAL FOOTBALL

LEAGUE's and NFL PROPERTIES LLC's (collectively, the "NFL") Application for a

Supplemental Order against Defendants GONG SUNMEI d/b/a NFL-2013.COM; WENG

DONG d/b/a NEWYORKGIANTSPROSHOP.COM; SU DANDAN d/b/a

NFLGOODSHOP.COM; XIONGJIN CHEN d/b/a NFLNIKEJERSEYSM.COM; MA QIFENG

d/b/a 2013-NEW-JERSEYS.COM; ZHENGFA XUE d/b/a NFLJERSEYS-SUPPLY.COM; XU

LIANG d/b/a WHOLESALE-NFL-JERSEYS-SHOP.COM; LILAN CHEN d/b/a

SNAPBACKHATSONLINE.COM; JONE JOCKE d/b/a CHEAPJERSEYSNEED.COM;

RIBERA SESMA d/b/a YOOCHEAPJERSEYS.COM; WANG SEEKBEST d/b/a

WHOLESALEJERSEYSES.COM; ZHENG LITTLE d/b/a

2012WHOLESALEJERSEYSNFL.COM; ZHANG QIAN d/b/a NFLNIKEJERSEYSM.COM;

ALVAREZ REGGIE d/b/a NFLSHOPUS.US; ESTHER ZIZZO d/b/a YERNFL.ORG;

WEIFANG d/b/a WHOLESALEJERSEYSBEST.COM; FANGXL d/b/a

FROMCHINAJERSEYS.COM; GROUP JERSEYS d/b/a GROUPJERSEYS.COM; GUIFAN

HUAN d/b/a BESTNFLJERSEYSSALE.COM; FANGXI CHENXIUQULI d/b/a

USWHOLESALEJERSEYSTORE.COM; and XYZ COMPANIES, JOHN DOES, and JANE

DOES (collectively, "Defendants").

  2.  I am the Chief Technology Officer at MarkMonitor, Inc. ("MarkMonitor").

  3.  I previously provided five declarations to the Court in this Action.  First, I

submitted a declaration dated April 15, 2013, in support of the NFL's *ex parte* Application for a

Temporary Restraining Order, Order to Disable Certain Websites, Asset Restraining Order,

Expedited Discovery Order, Order Allowing Service by Electronic Mail, and Order to Show

Cause for Preliminary Injunction Injunction against Defendants (the "April 15, 2013 Dagum

Declaration").  Following submission of the April 15, 2013 Dagum Declaration, I testified in

Court at the show cause hearing for the Preliminary Injunction Order entered in this action on

April 24, 2013.  Second, I provided to the Court a declaration dated May 16, 2013, in support of

the NFL's application for a Supplemental Asset Restraining Order and Order to Show Cause for

a Supplemental Preliminary Injunction Order (the "May 16, 2013 Dagum Declaration").  Third, I

submitted a declaration dated July 29, 2013, in support of the NFL's application for a

Supplemental Order (the "July 29, 2013 Dagum Declaration").  Fourth, I submitted a declaration

dated November 21, 2013, in support of the NFL's application for a Supplemental Order (the

"November 21, 2013 Dagum Declaration"). Fifth, I submitted a declaration dated March 18, 2014, in support of the NFL's application for a Supplemental Order (the "March 18, 2014 Dagum Declaration"). In the April 15, 2013 Dagum Declaration, the May 16, 2013 Dagum Declaration, the July 29, 2013 Dagum Declaration, the November 21, 2013 Dagum Declaration, and the March 18, 2014 Dagum Declaration (collectively, the "Prior Dagum Declarations"), I provided my background and the background of MarkMonitor. For convenience of the Court, I will briefly summarize that information here.

4.      MarkMonitor specializes in the development and implementation of technological applications for enterprise brand protection and anti-piracy efforts. As part of my duties, I oversee the research and development of MarkMonitor brand protection products and platforms. I have been employed by MarkMonitor for four years, and have over fifteen years of experience in analytical software technology.

5.      I received a Ph.D. in theoretical computer science from the University of Toronto and an M.D. from Stanford University, where I also led NSF and NIH funded research. I have published over 60 peer-reviewed articles in statistics, computer science, and biotechnology journals. I have been awarded more than a dozen technology patents.

6.      I am familiar with investigations regarding counterfeit apparel, among other goods. I am also very familiar with investigations regarding "rogue" websites—that is, websites that appear to be operated by a particular brand, often using the name of the brand in the website's domain name, which claim to sell genuine goods of that brand but that are in fact selling counterfeit products.

7.      If called upon as a witness, I could testify as to all facts set forth in this declaration from my personal knowledge and/or my review of MarkMonitor's files.

8.      As I averred in the Prior Dagum Declarations, I have become familiar with the
NFL and its federally registered trademarks and/or federally registered trademarks owned by one
of the thirty-two (32) Member Clubs that form the NFL (collectively, the "NFL Marks").  I am
also aware of the NFL's program to license the use of the NFL Marks on officially-licensed NFL
products, including football jerseys, headwear, t-shirts, other apparel, collectibles and other
merchandise (collectively, the "NFL Products").  I have also become familiar with counterfeit
products that falsely bear the NFL Marks, which are designed to look like genuine NFL Products
("Counterfeit Products").

9.      As described in greater detail in the Prior Dagum Declarations, MarkMonitor has
developed advanced technology that (1) determines whether websites are "rogue" in that they are
selling counterfeit products, rather than websites that are selling genuine or grey-market goods;
and (2) identifies connections between seemingly unrelated "rogue" websites such that the
"rogue" websites may be grouped into a network or networks of "rogue" websites, and the
operators of these "rogue" websites may be grouped into a network or networks of counterfeiters
who are cooperating in a joint enterprise.  MarkMonitor has used this technology to determine
that Defendants are jointly operating a large network of "rogue" websites (the "Infringing
Websites") that advertise, offer to sell, and/or sell Counterfeit Products to United States
consumers, including consumers in New York, in exchange for payment in U.S. Dollars via
PayPal, Western Union, and/or major credit cards.

10.      At the time I submitted the April 15, 2013 Dagum Declaration, MarkMonitor had
identified 1,476 Infringing Websites.  MarkMonitor subsequently identified an additional 521
Infringing Websites, as described in the May 16, 2013 Dagum Declaration.  MarkMonitor then
identified another 1,331 Infringing Websites, as described in the July 29, 2013 Dagum

Declaration. MarkMonitor later identified another 834 Infringing Websites, as decscribed in the November 21, 2013 Dagum Declaration.  As detailed in the March 18, 2014 Dagum Declaration, MarkMonitor subsequently identified yet another 815 Infringing Websites.

11.     Since I submitted the March 18, 2014 Dagum Declaration, MarkMonitor's advanced technology has continued to collect data from and about thousands of other "rogue" websites.  Using this newly-collected data, and applying the same methods described in the Prior Dagum Declarations and above, MarkMonitor has recently detected 760 additional Infringing Websites (the "Newly-Detected Infringing Websites") that, like the previously-detected Infringing Websites (i) have advertised, offered to sell, and/or sold Counterfeit Products to United States and New York consumers, and (ii) are operated by Defendants.  MarkMonitor has preserved screenshots of every Newly-Detected Infringing Website, which show that each of these websites was advertising and offering to sell Counterfeit Products.  A list of the domain names used in conjunction with Defendants' 760 Newly-Detected Infringing Websites is annexed as **Exhibit 1**.  Also listed in Exhibit 1 are newly-detected aliases, e-mail addresses, and physical addresses that MarkMonitor collected from the publically-available WhoIs information for these newly-detected domain names (*i.e.*, information provided by Defendants to Internet registrars when registering these domain names).

12.     At the NFL's request, as an added precaution, a MarkMonitor employee visited every Newly-Detected Infringing Website and a MarkMonitor employee reviewed the WhoIs information for every Newly-Detected Infringing Website to ensure that no legitimate websites authorized to sell NFL Products were included among the Newly-Detected Infringing Websites.

13.     Like the previously-detected Infringing Websites, Defendants intentionally designed the Newly-Detected Infringing Websites to convince unknowing consumers that the

websites are authorized to sell genuine NFL Products.  To this end, Defendants have continued

to copy and use the NFL's proprietary images and designs, including the NFL Marks.  The

Newly-Detected Infringing Websites are sophisticated-looking, are written in English, accept

payment in U.S. currency, and accept payment through PayPal, Western Union, and/or major

credit cards.  Defendants attempt to make the Newly-Detected Infringing Websites appear

legitimate by offering live customer service and by displaying logos that consumers associate

with secure and legitimate websites, such as the VeriSign® and McAfee® Security logos.  To

further induce consumers into purchasing Counterfeit Products from Defendants, rather than

authentic NFL Products from the NFL, its Member Clubs, or its business partners, Defendants

offer their Counterfeit Products at low prices, which they justify by claiming that their products

are "clearance" or "wholesale" items.  In addition, both to appear legitimate and to generate

higher rankings on Internet searches for "NFL jerseys" and similar searches, Defendants have

located many of the Newly-Detected Infringing Websites at domain names containing the NFL

Marks.

      14.     Each of the Newly-Detected Infringing Websites currently is active, or was active

within the past six months.  For several reasons that I have explained previously, however,

MarkMonitor has just recently detected these Newly-Detected Infringing Websites.  First,

Defendants have gone to great lengths to conceal the interrelationships between their Infringing

Websites (as discussed in greater detail in paragraphs 25-32 of the April 15, 2013 Dagum

Declaration), thereby limiting MarkMonitor's ability to link particular "rogue" websites to

Defendants.  Second, many of the Newly-Detected Infringing Websites first became active after

the previously-detected Infringing Websites were disabled.  Third, when these newly-activated

Infringing Websites became active, and/or when the content on active, undetected Infringing

Websites was modified, more data generated by Defendants was published to the Internet and, using this newly-collected data, MarkMonitor was able to refine its "fingerprint" for Defendants' Infringing Websites and thereby positively link additional Infringing Websites to Defendants. Accordingly, MarkMonitor has just recently obtained enough data to positively conclude that each Newly-Detected Infringing Website is a "rogue" website that uses the NFL Marks without the NFL's permission to advertise, offer to sell, and/or sell Counterfeit Products, and is operated by Defendants.

15.     Some of the Newly-Detected Infringing Websites currently are inactive, but it is very common that operators of large networks of "rogue" websites, like Defendants, will rotate which of their "rogue" websites are active at any given time.  This is a common tactic used by operators of "rogue" websites to avoid being detected and linked to known networks of "rogue" websites by brand owners and their investigators.  Given that each of the Newly-Detected Infringing Websites was active within the past six months, it is very likely that Defendants currently are "warehousing"—storing for future use, if needed—the domain names for the currently inactive Newly-Detected Infringing Websites.  Therefore, unless the domain names used in conjunction with both the currently active *and inactive* Newly-Detected Infringing Websites are disabled and transferred to the NFL, Defendants likely would seamlessly shift their operation to these "warehoused" domain names.

16.     As noted in my March 18, 2014 declaration, one of the previously-detected and since-disabled Infringing Websites, wholesalebestjerseys.com, had been resurrected at wholesalebestjerseys.org, a "warehoused" domain name that MarkMonitor linked to Defendants in early 2014.  These websites were virtually identical, indicating that Defendants simply copied the website coding from wholesalebestjerseys.com in order to create wholesalebestjerseys.org.  I

understand that wholesalebestjerseys.org was disabled pursuant to the April 1, 2014

Supplemental Order.  MarkMonitor recently determined that this website has been resurrected at

wholesalebestjerseys.net.  Indeed, the website banner on wholesalebestjerseys.net mistakenly

refers to wholesalebestjerseys.com, as does the "About Us" page in several sentences.  True and

correct copies of the wholesalebestjerseys.com homepage from April 5, 2013, the

wholesalebestjerseys.org homepage from March 10, 2014, and the wholesalebestjerseys.net

homepage and "About Us" page from July 18, 2014 are annexed as **Exhibit 2**.  This is an

example of Defendants recycling content from a disabled website to a new website located at an

alternate domain name.  Using such methods, Defendants have been able to quickly replace

disabled websites and thereby minimize downtime when their websites are disabled.

17.      It is very likely that Defendants currently are operating, and hereafter will create

and operate, additional Infringing Websites, which MarkMonitor has not yet identified but may

be able to identify as Defendants modify the content on their Infringing Websites and/or create

new Infringing Websites and, as a result, more data related to Defendants and their network of

Infringing Websites becomes available for MarkMonitor to analyze.

18.      As noted, MarkMonitor gathered e-mail addresses related to each Newly-Detected

Infringing Website from the WhoIs information for the domain names used in conjunction with

these websites.  These e-mail addresses are listed in Exhibit 1.  Each Newly-Detected Infringing

Website is associated with at least one of these e-mail addresses, and MarkMonitor has identified

a total of 504 unique e-mail addresses that are affiliated with the Newly-Detected Infringing

Websites.  Of these e-mail addresses, 110 e-mail addresses were already associated with

Defendants, which is consistent with Defendants' interrelatedness and Defendants' use of

multiple aliases.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in San Francisco, CA on August 5, 2014.

PAUL DAGUM